May it please the Court. My name is John Devine. I, along with my colleague, Tom Blake, from the California Department of Justice, represent the appellant, CHP officer, Stephen Margraf, in this appeal. I would like to reserve five minutes for rebuttal time. Mr. Blake and I are going to switch the merits argument and the fees argument five minutes apiece. The issue that I would like to start off with and the issue that I would like to focus on is the issue of qualified immunity. And to that end, I would like to highlight the factual situation because any analysis of qualified immunity requires a hard look at the totality of circumstances that the officer faced. And in this incident, Officer Margraf faced the continual reckless, dangerous, and constantly indifferent actions of the decedent. There was a 100-mile-an-hour chase from counties across the Bay Area and over the Bay Bridge into San Francisco. There was an incident in San Francisco, as the chase continued, where the decedent went the wrong way on a one-way street and came within a matter of feet of colliding with both Officer Johnson and Officer Margraf. The decedent finally pulled into a cul-de-sac, and at that time, Officer Johnson, who was driving his patrol car with Officer Margraf in the passenger seat, pulled in behind to the rear of the vehicle, and the decedent rammed that car while Officer Johnson was in it. From the time of the first ramming until the shooting, only 25 seconds had elapsed. So the following events occurred within that 25-second time. The first ramming occurred with Officer Johnson in the car. Officer Johnson got out of the car. The decedent then pulled up toward a chain-link fence, rammed the car again. Other officers began arriving at the scene. At the time of the shooting, there were a total of six officers. The officers all described a very chaotic and dynamic event that was unfolding in front of them. Sotomayor, what is the universe of cases that you believe we should look at in order to decide whether what clearly established law was at the time of the incident? I think Rousseau is most on point, and we argued that to the district court. Since that time, the Wilkinson case was recently ---- Well, yes, but that would not have informed the officer at the time. That's correct, Your Honor. What I wanted to mention in that was I think the Wilkinson case shows that the law was not clearly established at the time Officer Margrave acted. That incident was actually a year before the shooting in this case. But there are also some different cases that I cited from different circuits, not in this circuit, from a number of different circuits in both my opening brief and reply brief, and I think those should all be replied. This is a little complicated by the fact that you've got a Fourteenth Amendment substantive due process issue, whereas those cases and, you know, in fact, almost every case is a Fourth Amendment case. That is correct. And the standard is different under the two. And how does, in your judgment, does that factor into the analysis? How I believe that factors into the analysis is the Fourteenth Amendment actually is a higher standard for a plaintiff to meet. In the Brousseau case, there was a — there was no clearly established law, and that was, as you note, under the Fourth Amendment analysis, which is just a reasonable officer, not this higher standard of the purpose to harm unrelated to a legitimate law enforcement purpose. So if Officer Margrave would have met the clearly established standards from Brousseau, Wilkinson, these other circuit cases that are mentioned in the briefs, then he certainly would have come under — his actions certainly would have been constitutional and not exceeded the limits of the Fourteenth Amendment. The Wilkinson case, I just note to the Court, does have a slight Fourteenth Amendment analysis. The fact is, is that Officer Margrave had no notice that his actions would have exceeded the constitutional bounds. And he essentially, and other officers similarly situated, would be paralyzed by this notion that you should look at both the objective factors and then address any underlying subjective motivations. And that's where the district court improperly applied the test, is it continually looked toward the improper motives and shrunk the analysis unduly when it's axiomatic that you look at the totality of the circumstances and you look at the objective facts. And with that, you find under this situation that Officer Margrave really had no other option available to him. I would just mention with respect to the issue of what cases the Court should look to, I did mention Brousseau and Wilkinson. But the burden falls on the plaintiffs to come up with cases that show the right is clearly established. The burden is really ours to do that. Right. I mean, at the end of the day, they're supposed to help us. But as the Supreme Court made pretty clear in a case that I am well familiar with, it's really up to the Court to define the universe of cases and say what the law is or was. I understand that. But plaintiffs have never raised a case to show where Officer Margrave would have been put on notice that his actions had exceeded the Fourteenth Amendment constitutional limits. And with that, I'll turn it over to my colleague, Mr. Blake. Truly. May it please the Court. My name is Tom Blake. I'd like to address the attorney's fees aspect of the case. As Mr. Devine said, we believe this case should have been resolved by the Court before trial on qualified immunity. That would have mooted the whole issue of attorney's fees. The qualified immunity is, of course, an immunity from the cost and expense and stress of a trial, as well as from potential liability. In this case the trouble, the trouble really on the attorney's fees issue is that there's an abusive discretion looking at a district court's responsibility to weigh, I think it's six factors, but a whole bunch of factors, and come out with a bottom line. And the district court touched all the bases that it's supposed to, and nevertheless found that the want of success didn't, you know, wasn't trumped by, or was trumped, in effect, by the contribution of the public interest. Yes, Your Honor. And if we reach the question of attorney's fees, then it's not our position that there should not have been an award of attorney's fees. I understand. Some reasonable attorney's fees award in that situation was clearly appropriate. However, this award is inappropriate in a number of aspects. One, it's clearly disproportionate because, as this Court said in the Guinness v. Kentucky Fried Chicken case, no reasonable person would spend over half a million dollars to get a $60,000 verdict. And that's what we ultimately came out with here. This case could have been and should have been settled. Counsel were well aware of the real value of the case all along. Ultimately, in argument, plaintiff's counsel asked the jury for a monetary award, not putting a precise dollar amount on it, but telling the jury that what they should award, in essence, was the cost of a good used automobile. And the jury did exactly that. They gave them $30,000 apiece for each of these children. And the jury sent out a question during deliberation asking if they could designate that verdict or a verdict as a college fund. Clearly, there was an element of sympathy in this case. And we, going into the case, were certainly well aware of that aspect of the case. And the CHP was not adverse to settling this case, unlike some allegations in the plaintiff's papers. The CHP knew that there was a potential for a verdict in that regard, was willing to settle it, tried to settle it. And all along, everybody knew this case was something in the range of what the jury actually awarded.  But the case did not settle. And it did not settle for a variety of reasons having to do with the fact that basically this case was fee-driven from the outset, or at least from the time that it went to trial. The award in this case, substantive fees, were $489,000 to Plaintiff's Counsel for the merits work, and expenses of $6,400. And by the time we're all said and done, this case is going to cost California Highway Patrol $600,000 and incentive. And that's not the case. Yeah. I was trying to get you to focus in. I mean, I'm going to come out differently. I might not have. I don't know. I wasn't on the site. But the question here is where did the district court mess up so badly that it's an abuse of discretion in weighing all of the factors that it has to take into account? The attorney's fees is too high an amount. And in effect, it's a stealth award of punitive damages against a public entity, in effect. It's stated to be against Officer Margraft. But everybody knows that a California Highway Patrol officer isn't going to pay more than half a million dollars in attorney's fees. The only result of giving Plaintiff's Counsel basically top dollar, the court awarded every hour of the requested load star and awarded it at an absolutely top rate, $600 an hour, when Mr. Scott's own fee agreement with his client provided for 25 percent of the results, which here would have been $15,000, or $500 to $550 an hour. And the court exceeded what even was recited in the fee agreement. It's clearly, whether intended to be or not, it's clearly an improper punitive damages award against a public entity. And I'll reserve the balance of our time unless the Court has other questions. Okay. Thank you, Mr. Boyd. Good morning. If it pleases the Court, I'm John Scott. I represent the appellees and the plaintiffs. I am sharing my time with Mr. Schwartz, who will be arguing the fee issues. I just heard something I thought was very telling, and that is that the appellants knew there was a potential for a verdict. They knew there was a potential for a verdict for two reasons. Because the law was clearly established, and because there were issues in dispute that the jury would have to decide, and ultimately, as one officer's word against five other officers' word. Well, the question is there is a tribal issue, a fact that as to whether a constitutional violation occurred. Yes. That doesn't solve the qualified immunity question, which is whether that law was clearly established at the time of the incident. Well, Your Honor, the district court on summary judgment addressed that issue. And then the district court did was basically say, look, the constitutional standard under the 14th Amendment is whether there was a purpose to harm without a legitimate law enforcement objective. And it follows, I think was her exact phrasing, it follows that there can't be qualified immunity. And it seems to me like that may well have collapsed the two inquiries and made it one, which we know it can't happen. Well, Your Honor, the law was established that the test, the legal test which the jury was instructed under, was there a purpose to harm unrelated. It's just like saying the law has been well established since the country was founded, that you can't have an unreasonable search and seizure. But that doesn't get you anywhere. You've got to bring it down to some level of specificity that has some reality to the circumstances. So my question to you, in effect, is precisely the same question I asked Mr. Devine, and that is, what is the universe of cases that you say we should consider in deciding whether the law with respect to what happened here was clearly established? Well, Your Honor, I believe if you look at Lewis-Morland in conjunction with Brousseau, Brousseau was a Fourth Amendment case, but it did deal with the issue of when there is a high-speed chase, under what circumstances is deadly force permissible or not permissible? And in that case, I recognize it wasn't a Fourteenth Amendment case. However, the analysis that had the Graham analysis and the totality of the circumstances, which is part of the also the Fourteenth Amendment analysis, you look at the totality of the circumstances. Now, what distinguished this case from Brousseau and what distinguishes it from almost every other case the defendants have cited is that if there is a high-speed chase and you do not have containment, and the car, that vehicle, is capable of escape or of injuring an officer at the scene, in those circumstances, an officer, if he perceives, and it's the perception of the officer, and that was the issue that went to the trial in this case, what did the officer perceive, what he said he perceived, or what he actually perceived. But if the officer perceives that this vehicle is capable of escaping and causing harm to others, or if this vehicle is capable of harming officers at the scene, deadly force is justified. You've taken probably three times as long as that incident did to answer the question. Well, and if so, we're talking about something that a police officer had to make that whole calculus that took you at least 50 seconds, probably more, to describe. And I don't know what it means, frankly. I mean, you've made a generalized statement. But he had 25 seconds to make a judgment call. It took you longer than that to describe to judges. And what did he do in those 25 seconds? He initially he approached the car and the car backed up and slammed the car behind it, and he was asked to try. And this was at least 15 seconds before he started firing. And he was asked at trial, you're there at the scene, you're standing next to the car, the car goes backwards and hits a police car behind it, you know, behind it, why didn't you fire then? He was asked that. This was 15 seconds before he started shooting. And his testimony was, Your Honor, that there was and I want to give you the citation it's at ER 145, he did not shoot because he did not see a threat to anybody's lives. So he's at the car, the car has the initial ram, it was after the third ram that he fired, he's standing at the car, it backs up and hits a police car, why didn't you shoot then? And he also in his testimony describes a number of things he did between that moment and between when he opened fire. And it's that, the point is that you have five other officers there including his supervisor who was trying to control the scene, and nobody else sees a threat. Counsel, I'm a little confused at the point you're making. Are you saying it would have been constitutional had he fired immediately after 15 seconds? No, well, he said there was no threat. That's not my question. Well, if it's no threat. I'm trying to follow your point. And you said he didn't fire then, therefore what? He didn't because there was no threat then and there was no threat later. There was never a threat. There has to be an actual threat, not an imagined threat. So had he fired then, you would be arguing today that it was unconstitutional. If all the other officers at the scene said at that time there was no threat and it wasn't reasonable for him to perceive a threat, yes, I would. But we're looking, you know, it's the totality of the circumstances and it's their immediate threat at the time the shot is fired. Otherwise, the rule, why don't we simply have a rule every time there's a high-speed chase, at the end of it, just go up and execute the driver? We could have that rule, but we don't. And that wasn't the defense in this case because they knew under the law you can't justify just walking up at the end of a high-speed chase and executing the driver because, you know, the driver was reckless, the driver could have hurt somebody. You know, something might happen in the future we don't know about. There has to be an immediate threat. And the fact that there's no immediate threat, in your view, posed by the use of a vehicle, which is a deadly weapon, to keep ramming a car and turning it around such that he could possibly exit, and posed by the fact that there are other officers present who were told to avoid crossfire, and that the officer had tried to get her to stop it, I can't remember whether he tried to get her out of the car. As I do remember, he tried to get into the car so that he could stop it. And was unsuccessful in those things. If you add in those facts, too, does that not make any difference? Well, you have the jury had to decide who to believe here in terms of was there an immediate threat, and did he fire just for the purpose of causing harm, or was it unrelated to a legitimate police purpose? Okay. So I'm not quarreling with the jury's conclusion that there was a constitutional violation. What we're talking about now is whether that would have been clear to the officer at the time. It had to be clear to any officer that you don't shoot someone who does not pose an immediate threat to you. And there were five other officers there who all testified at trial at the time he fired, they did not observe an immediate threat to anyone, themselves or Officer Markrath. And so that's what the jury had to decide. Under the circumstances at the time he fired, was there an immediate threat? The theory at trial was that he had no right to start firing. Under all of the circumstances that we've gone through. If he saw what every other – he was standing right next to Sergeant Clare. He saw what she saw. She saw no reason to shoot. He saw something that no one else saw. He saw the car going backward. The car wasn't going backward. His rationale for the reason – And your position is, if I get it right, that there is no wiggle room for a mistake in that period of time under those circumstances? Oh, there may be wiggle rooms for mistakes. But the issue here is, is we had a – the jury had to decide whether he was lying, whether this was a post hoc fabrication or a mistake or what was it. The theory of the case was he made up a story. He came up with a post hoc fabrication to justify a shooting he knew was bad and the other officers at the scene knew was bad. Now, can we sit back here, hindsight and speculate, well, maybe this, maybe that? There's a lot of maybe, maybe, maybe. But the jury had to decide, did this reach that level of purpose to harm? Yeah, we're – I just want to try one more time. All right. We're not talking about whether there was a constitutional violation. We're talking about whether there's qualified immunity. That is, whether, if there were a constitutional violation, it would have been a reasonable officer, objective test, not subjective, an objective, reasonably objective – excuse me – objectively speaking, would a reasonable officer have been fairly unnoticed that what he did in that 25 seconds would be a violation of our constitutional rights? Absolutely. And that's why he lied, because he knew it was a bad shooting. He knew there was no threat. Okay. He knew there was no reason to fire, which is why he made up the lie the car was going backwards. And from – you would get that out of Grusseau and Lewis. Yes, the basic proposition. If I get you right. Yes. And Moreland. And who? Moreland. Moreland's the Ninth Circuit case that followed Lewis. I'm sorry. You know, for everybody who's making an argument today, you've got to realize this room is real – it's just marble and sound just floats around unless you're right into the microphone. So if you can remember, kind of. I apologize, Your Honor. The Moreland case was a Ninth Circuit decision that came soon after Lewis. It adopted the Lewis 14th Amendment test in a case involving a police shooting in Nevada. Moreland, it was cited by the district court judge. It was a shooting case. And it was not an innocent bystander getting hurt in a chase. But if you look collectively at Lewis and Moreland and Grusseau, it sets the standard here for use of deadly force in a situation – in a 14th Amendment situation which we have here because there's a death. And it's the right of familial association in the 14th Amendment that gets us here. And we have a clear legal standard that's existed since 1998. Now, is there another case exactly like this one before this occurred? No. Is there one exactly like this one since this has occurred? No. But in determining qualifying immunity, the issue is, is the law clearly established, not is there a case on all fours. Can I? This may not help, but suppose he had gotten up and testified, you know, I made a terrible mistake. Things were happening too – so quickly. I thought that this – they were at risk. I realized that I was wrong. Okay. What would then be the legal situation in terms of his liability under the law at that time? If you want me to assume he's telling the truth and that it's not a post-act fabrication, but if you're asking me if the jury – He – well – If the jury believed him? If the jury believed him, I don't think it would meet the 14th Amendment test. If the jury believed him, he said this was a mistake. Well, your argument is it was all a fabrication. Yes. And he gets up and says, I thought this was true, but it wasn't true. So I'm taking your version of the events. But he didn't say that. But I – And we're trying to establish what the law is at the time. Would that – would he have been liable? If the jury believed him that there was no purpose to harm, okay, that then he might not have been liable. I mean, these are hypothetical questions that are very difficult to answer in the abstract, but I would submit to you that the 14th Amendment test is much higher than I made a mistake. It's a purpose to harm. And the jury had to decide in this case, in my view, and this was the way I argued the case to the jury, it comes down to Officer Marcraft's credibility. He knew that there was no reason to shoot. He knew that there was no immediate threat. He knew exactly what the – So it was a summary execution. I didn't use those terms, but – and I wouldn't use those terms. Well, I mean – Very simply, he didn't follow his training. And one thing very interesting, part of the record in this case, and out of his own words, and it's in pages 143 and 144 of the excerpts of the record, Officer Marcraft was asked about his training in these types of situations where you have a felony car stab. And he testified, based on his training for a felony car stab, which is what this was, that you call for a supervisor, you take a position of cover, and you contain the area, which is what everybody did there except him. There was a supervisor there who was controlling everybody except him. Everybody was in a position of cover except him. He walked up to the car. Everyone else was in a position of cover, and the area was contained. So you have five officers following their training who have the situation under control. And he is – he is out of control, and there was evidence to support the jury's verdict that he acted with a purpose to harm. The FUs going back and forth, the way he was acting out, this man was upset and angry. And the way I argued to the jury, and I think it was supported by the evidence, is that he didn't like the fact that she wasn't obeying his commands. And instead of following his training, he was going to be, you know, Mr. Cowboy, Mr. Courageous, and go up and get her to stop the car right away instead of giving her time to just realize this is futile, I might as well just give up. He couldn't wait for that. And when she – when he – she refused his commands, and when the FUs are going back and forth, and he's also saying FU to her, it escalated into, okay, you aren't going to follow my commands? You're going – I understand that you're entitled to the benefit of those findings. I just asked my question trying to establish what the law was at the time. Okay. Well, I believe the law was clearly established that there's no immediate threat that you just can't use deadly force if it isn't to, you know, to protect someone else or yourself, just because you're upset that somebody is not obeying your commands doesn't give you a reason to execute that person, even if – even if there was a high-speed chase. Thank you, Mr. Scott. You've weighed more than you used up your side's time. Would you like to take a minute to – I don't think the attorney's fees is very complicated. The – I just want to say with regard to the proportionality argument that Section 1988 fees are not reserved for easy cases. As the Court knows, this was a difficult case, factually. It took a lot of work. And little kids, 10 and 12 years old, deserve the same kind of representation that anyone else deserves. And when the defendants put up a militant defense, it's going to take a lot of work on the part of the plaintiff. The judge, the district court judge, followed the lodestar method, which is required by the Supreme Court of the United States and Hensley in the latest decision, Perdue v. Kenny S., from last year. She did exactly what she was supposed to do. She scrutinized the amount of time that was spent. She looked to see whether it was a reasonable amount of time. She measured the market hourly rates for the district, Northern District of California. She applied them to the lawyers who worked on the case, and she came out with a number of different numbers. So there was no abuse of discretion. This Court has said that with regard to proportionality, the district court has to consider it, and that's exactly what Judge Ilston did. Thank you. Thank you, Mr. Schwartz. Mr. Devine. I'll take your admonition to speak right into the telephone. Plaintiff's appellee's counsel, in his argument, did what the district court did in their opinion, and that was to inappropriately collapse the qualified immunity test. Counsel is arguing the broad standard, and everybody acknowledges, including the district court, what that broad standard is. It's the second prong of the qualified immunity test as to whether it was clearly established, and the court asked earlier what cases that we were relying on. Specifically, we're relying on the cases Brousseau, Wilkinson was obviously decided after, but also the cases in our opening brief from pages 33 to 38, from other circuits as well, and then our reply brief from pages 15 to 21. Because if you look at Brousseau, Wilkinson, and those cases from the other circuit, it clearly shows that Officer Margraf was not put on notice that the actions he took out there took and would have exceeded the constitutional limits. I think it's axiomatic from all these cases that there have to be allowances made for split-second judgments, and in this instance, the time from the first ramming until the shooting lasted 25 seconds. During that 25 seconds, Sergeant Clare gave an instruction to watch out for crossfire. All of the officers at the scene had drawn their weapons. Two other officers during that 25 seconds also contemplated shooting. Officer Nielsen thought the situation was so dynamic and chaotic that he might have to shoot, and Officer Ogilvie contemplated shooting as the car reversed toward him, and then he was either contemplating shooting or diving for the sidewalk. So I just wanted to highlight those facts as to the dangerousness of the situation at all times out there, and at no point during this incident did the decedent ever give any indication or surrender or cease her actions. Without any further questions from the Court, I'll submit. Thank you, Mr. Fein. Thank you, Counsel. The matter just argued will be submitted. Thank you.
judges: Trager, Alarcon, Rymer